UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.

JANET FRANCIS,

    Plaintiff,

v.

MSC CRUISES, S.A.,

    Defendant.
_____/

## **COMPLAINT**

Plaintiff sues Defendant and states at all material times:

1. This Court has diversity subject matter jurisdiction over this case because Plaintiff is a Florida citizen, Defendant is a Swiss citizen, and more than $75,000 is in controversy.

2. This Court has personal jurisdiction over the parties because they agreed to litigate their dispute in a court in Broward County that has subject matter jurisdiction over their dispute.

3. This Court is a proper forum located in the proper venue for this case because the parties agreed to litigate this dispute in Broward County, FL.

4. Plaintiff satisfied all conditions precedent or they are waived.

5. MSC Cruises, S.A. owned, possessed, and controlled a cruise ship called *Divina*.

6. Plaintiff was a ticketed passenger lawfully aboard the *Divina* for a multi-day cruise in July of 2017.

7. The cruise transported Plaintiff and other passengers between at least one domestic port (Miami) and one foreign port (Freeport).

8. MSC owed Plaintiff a duty to act reasonably under the circumstances with regard to her safety. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959).

**The Circumstances**

9. MSC claims to have "unparalleled maritime expertise based on 300 years of seafaring tradition."

10. MSC states:

    a. "The MSC product is constantly being updated to meet our guests' needs."

    b. It is "committed to excellence, professionalism and dedication."

    c. "The safety of our guests … is always a top priority for us."

    d. "Each time we set out to develop a new class of ship, we start from a blank sheet and draw a completely new prototype."

    e. "We fully revisit the marine architecture and design of the ship in all its aspects. This is an approach that is unique to MSC Cruises."

11. MSC and the *Divina* had many certifications from Bureau Veritas, ISO, and OHSAS related to, among other things, passenger and crew safety.

12. A core concept of the OHSAS 18001 Certification is, "Plan, Do, Check, Act."

13. That OHSAS concept is similar to the "continual improvement" concept embodied in the ISO 9001 Certification held by MSC and the *Divina* and the quality management system (QMS) used aboard the *Divina*.

14. ISO 9001 is an industry standard that sets requirements for a QMS that helps businesses be more efficient and improve customer satisfaction.

15. A QMS is a way of defining how a business meets the needs of its customers and others affected by the business.

16. ISO 9001 is based on the idea of continual improvement.

17. ISO 9001 certified businesses must determine analyze their operations and determine how to continually improve operations for the benefit of customers and the public.

18. Businesses using an ISO 9001 QMS must assess their operations and identify, define, and address areas needing improvement.

19. ISO 9001 businesses put the customer first and ensure the customer's needs are being met.

20. ISO 9001 businesses identify and address the risks associated with their operations.

21. ISO 9001 businesses focus on risk-based thinking.

22. The identification and correction of risks associated with the business is a key aspect of ISO 9001 certification.
23. MSC and the *Divina* also many other certifications related to the safe operation of its business and ships like ISO 14001, ISO 22000, Pearl ISO 50001, and many others.
24. All of those certifications show MSC was aware of, and undertook to comply with, many industry standards applicable to human safety aboard its ships, one of which was the *Divina*.
25. MSC has known for many years before Plaintiff's cruise that slipping hazards on the decks of its ships are a constant source of injury to folks aboard the ships.
26. MSC has known for many years before Plaintiff's cruise that industry standards require ships to have safe, slip-resistant walking surfaces in areas like where Plaintiff was injured on the ship.
27. MSC has known for many years before Plaintiff's cruise that quick identification and removal of slipping hazards on its ships is a reasonable way to protect against slip and fall injuries.
28. Despite its claim that MSC is constantly improving the safety and operation of its ships, MSC has not improved the safety of its decks and protecting folks on board from slipping hazards.  The following is just a sample of the endless train of folks who have been injured by slipping hazards on the decks of MSC's ships.
29. Between 2001-2005, MSC built and put into service its Lirica class of ships consisting of the *Armonia*, *Sinfonia*, *Lirica*, and *Opera*.
30. On or about February 15, 2007, Sue McDonald slipped and fell on a slippery wet substance on a deck of the MSC *Lirica*.
31. On or about April 15, 2007, Judith Lagasse slipped and fell on a slippery wet substance on a deck of the MSC *Lirica*.
32. On or about January 4, 2009, Mary Chappel slipped and fell on a slippery wet substance on a deck of the MSC *Lirica* near a food area.
33. Between 2006-2010, MSC built and put into service its Musica class of ships consisting of the *Musica, Orchestra, Poesia,* and *Magnifica.*
34. Based on MSC's statements and certifications, MSC's knowledge and experience would have gone into improving this most recent class of vessels over the last class.  Based on

MSC's statements and certifications, MSC was constantly improving its operation of it ships and safety rules to protect folks aboard its ships better than it did on earlier ships. Apparently, that didn't happen because folks kept slipping and falling on MSC ships.

35. On or about March 26, 2009, Vincenza Piergiovanni slipped and fell on a slippery wet substance on a deck of the MSC *Orchestra*.

36. On or about April 15, 2009, Rafael Santisteban slipped and fell on a slippery wet substance on a deck of the MSC *Orchestra* near a food area.

37. On or about April 8, 2010, Leonor Olano slipped and fell on a slippery wet substance on a deck of the MSC *Orchestra*.

38. On or about November 16, 2011, Fred Bill slipped and fell on a slippery wet substance on a deck of the MSC *Poesia*.

39. On or about February 14, 2013, Sharon Betterman slipped and fell on a slippery deck near a food area on the MSC *Poesia*.

40. Between 2008-2013, MSC built and put into service its Fantasia class of ships consisting of the *Fantasia, Splendida, Divina,* and *Preziosa.*

41. Based on MSC's statements and certifications, MSC's knowledge and experience would have gone into improving this most recent class of vessels over the last class. Based on MSC's statements and certifications, MSC was constantly improving its operation of it ships and safety rules to protect folks aboard its ships better than it did on earlier ships. Apparently, that didn't happen because folks kept slipping and falling on MSC ships.

42. On or about November 24, 2013, Olga Rosales slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina* near a food area.

43. On or about December 11, 2013, Michelle Parker slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

44. On or about January 9, 2014, Mike Shaver slipped and fell on a slippery wet substance on a deck of the MSC *Divina* near a food area.

45. In the Shaver case, MSC resisted revealing the true extent of how many folks MSC injures in slip and falls on its ships. It finally admitted to twelve other victims in answers to interrogatories in the Shaver case. It appears the number is much higher than that.

46. On or about April 19, 2014, Lidia Laurita slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

47. On or about September 14, 2014, Martin Cohen slipped and fell on a slippery wet substance on a deck of the MSC *Divina* near a food area.

48. On or about September 24, 2014, Hilda Ruiz slipped and fell on a slippery wet substance on a deck of the MSC *Divina* near a food area.

49. On or about October 25, 2014, Beverly Michilin slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

50. On or about March 25, 2015, Gilma Velandia slipped and fell on a slippery wet substance on a deck of the MSC *Divina* near a food area.

51. On or about April 12, 2015, Aida Montaine slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

52. On or about January 29, 2016, Constance Dillon slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

53. On or about March 31, 2016, Soo Ko slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

54. On or about May 21, 2016, Richard Rotti slipped and fell on a slippery wet substance on deck seven of the MSC *Divina*.

55. On November 6, 2016, Josefa Rado-Perez slipped and fell on a slippery deck near a food area on the MSC *Divina*.

56. On or about December 31, 2016, Alina Salum slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

57. On or about March 23, 2017, Margaret Anne Haiser slipped and fell on a slippery wet substance on deck fifteen on the *Divina*.

58. On or about April 1, 2017, Deborah Armstrong slipped and fell on a slippery wet substance on deck fourteen of the *Divina*.

59. On or about April 30, 2017, Nardine Aziz slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

60. On or about June 18, 2017, Santhia Olivier slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

61. On or about September 1, 2017, Sylvia Bauerschmidt slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

62. On or about October 30, 2017, Corrine Piccinetti slipped and fell on a slippery wet substance on deck fourteen of the *Divina*.
63. Despite all of MSC's claims of maritime expertise, attention to safety, and industry certifications, and constant improvement, the facts show MSC has not responded appropriately to the disturbing trend of folks being injured in slip and falls on its ships.
64. Despite all of MSC's claims of maritime expertise, attention to safety, and industry certifications, and constant improvement, the facts show MSC still uses decking materials that are unreasonably slippery.
65. Despite all of MSC's claims of maritime expertise, attention to safety, and industry certifications, and constant improvement, the facts show MSC still uses unreasonably dangerous practices regarding finding and removing slipping hazards on its ships.
66. MSC's Passenger Injury Statement tells you exactly where MSC's head is with regard to passengers who are injured on its ships.  It asks the passenger to indicate:

    **I blame the accident on**
    **[ ] My self**
    **[ ] No one was to blame**
    **[ ] Other (plese specify)**

67. MSC encourages the passenger to take the blame, then blame nobody, or if the passenger is not too overcome by pain, shock, and injury, then to have the presence of mind to write in and assign blame to MSC.  Those aren't typos above.  MSC apparently doesn't take the time to check the spelling of the words on its forms.
68. Before Plaintiff was injured, MSC knew liquids and food were constantly being spilled on the decks of its ships.
69. Before Plaintiff was injured, MSC told the workers on its ships to look for slipping hazards on the deck and clean them.  For example, as far back as May 15, 2004, MSC issued a fleet-wide housekeeping bulletin as part of its Standard Procedure Manual warning of the slipping hazard created by wet decks on MSC's ships.  The bulletin specifically mentions "food" being a cause of slipping hazards on the decks of MSC's ships.

70. Thus, MSC and the workers on its ships have known for years before Plaintiff was injured that food on the decks of its ships needed to be found and removed before it caused someone to slip and fall.
71. MSC was involved in the design of the ship and her decks.
72. MSC was involved in the selection of the deck coverings used on the ship.
73. MSC inspected, accepted, and approved the ship and her deck where Plaintiff was injured, before she was placed into service.
74. The material used on the deck of the ship where Plaintiff was injured was unreasonably slippery.
75. MSC created and implemented the deck safety policies used on the ship that failed to protect Plaintiff from the slipping hazard.
76. The circumstances show MSC knew or should have known the decks of its ships were unreasonably slippery, but MSC failed to correct that problem.
77. The circumstances show MSC knew or should have known it had a serious problem with food, liquids, and slippery substances constantly causing folks to slip and fall on its ships, but MSC failed to correct that problem.
78. The circumstances show MSC knew or should have known it had a serious problem with folks slipping and falling on its ships, but MSC failed to correct that problem.
79. The circumstances show MSC knew or should have known its deck safety policies were unreasonably dangerous, but MSC failed to correct that problem.
80. The circumstances show MSC knew or should have known of the slipping hazard that injured Plaintiff before she slipped and fell, but MSC failed to correct that problem.

## MSC Injures the Plaintiff

81. On or about July 10, 2017, Plaintiff was walking on deck fourteen of the *Divina* not far from a food area.
82. She was walking toward an area where some female crew members who looked like maids were standing talking to each other instead of doing their jobs.
83. Plaintiff suddenly slipped and fell on a slippery wet substance on the deck.
84. Plaintiff did not notice the slippery wet substance before she slipped and fell.
85. It looked like fruit was part of the substance.

86. The female crew members were standing only feet away from Plaintiff when she slipped and fell.
87. The maids were rude to Plaintiff after she fell and was on the ground in pain.
88. The fall caused Plaintiff, among other things, a displaced right knee lateral tibial plateau fracture that required an open reduction and internal fixation with Allograft bone grafting.
89. Plaintiff's medical bills are over $100,000.

## Count 1 – Negligence

90. Plaintiff incorporates paragraphs 1-89.
91. MSC owed Plaintiff a duty to act reasonably under the circumstances with regard to her safety. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959).
92. MSC breached its duty by:
    a. Allowing the slippery wet substance to be on the deck where it caused Plaintiff to slip and fall;
    b. Its female crew members willfully and wantonly refusing to do their job to clean up slipping hazards like the one that injured Plaintiff even though they were in the area before Plaintiff and only feet away from where Plaintiff slipped and fell;
    c. Willfully and wantonly failing to respond properly to the constant problem of folks slipping and falling on MSC's ships;
    d. Choosing and/or approving a deck material that was unreasonably slippery;
    e. Choosing and/or approving a deck material that was unreasonably slippery when food and/or liquids was on it;
    f. Failing to reasonably inspect the deck material, discover it was unreasonably slippery, and make it safer;
    g. Failing to reasonably inspect the deck and remove the slipping hazard before Plaintiff slipped and fell in it;
    h. Failing to reasonably inspect the deck and cordon off the dangerous area where Plaintiff slipped and fell;
    i. Failing to reasonably maintain the deck by removing the slipping hazard from the deck;

j. Failing to respond properly to the problem of folks slipping and falling on the decks of MSC ships;

k. Failing to have sufficient crew members looking for and correcting dangers on the deck;

l. Failing to provide a reasonably safe deck for Plaintiff to walk on;

m. Failing to warn Plaintiff of the hidden slipping hazard on the deck;

n. Failing to properly train its employees on deck safety to ensure they understood and implemented MSC's deck safety rules;

o. Failing to properly supervise its employees to ensure they followed MSC's deck safety rules; and

p. Engaging in a negligent mode of operation that allowed the foregoing to occur (collectively "the dangerous conditions").

93. The dangerous conditions exposed Plaintiff to a foreseeable zone of risk.

94. MSC knew about the dangerous conditions, or they existed long enough that MSC should have discovered them in exercising due care, or they occurred with such frequency that MSC was on notice of them.

95. Alternatively, MSC created the dangerous conditions.

96. On or about July 10, 2017, MSC's breach directly and proximately caused Plaintiff to slip and fall and suffer permanent bodily injury, pain, disability, loss of capacity for the enjoyment of life, mental suffering, injury-related expenses and losses, aggravation of pre-existing condition, past lost wages, and loss of the pleasure of the complete cruise and Plaintiff demands a refund for all cruise money.

97. The conduct of MSC and the ship's crew, with regard to Plaintiff's safety, rises to the level that warrants punitive damages.

Wherefore, Plaintiff asks for:

a. Damages in an amount proven at trial;

b. Punitive damages; *See Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 414 (2009) ("the common-law tradition of punitive damages extends to maritime claims"); *Fleischer v. Carnival Corp.*, 2016 WL 1156750, at **1-2 (S.D. Fla. Mar. 17, 2016) (two prior incidents sufficient for punitive damage pleading);

c. Cost of suit;

    d.    Prejudgment interest where applicable; and

    e.    Jury trial.

> LAWLOR WHITE & MURPHEY, LLP
> **Counsel for Plaintiff**
> 2211 Davie Blvd.
> Ft. Lauderdale, FL  33312
> 954-525-2345
> 954-730-8908 fax
> bmurphey@lwmlegal.com
> beller@lwmlegal.com
>
> By:  /s/ Ben Murphey, Esq. (25489)